UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                                                **MEMORANDUM**
                                                                              **OPINION AND ORDER**
FRED MASTROIANNI,
                                                                              20-CR-00575 (PMH)

                            Defendant.
-----------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

        Fred Mastroianni ("Defendant") stands charged in a six-count indictment of: (i) receipt and distribution of child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(B) and (b)(1); (ii) possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2; (iii) coercion and enticement in violation of 18 U.S.C. §§ 2422(b), 2427, and 2; (iv) coercion and enticement in violation of 18 U.S.C. §§ 2422(b) and 2427; (v) sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) & (e), and 2; and (vi) sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) & (e), and 2. (Doc. 13).

        Pending presently before the Court is Defendant's motion under Federal Rule of Criminal Procedure 12(b)(3) to suppress statements he made to law enforcement agents on August 20, 2020 and evidence obtained derivatively therefrom. (Doc. 69 ¶¶ 1-2). Defendant served and filed his motion papers on July 6, 2022. (*Id.*; Doc. 70, "Lewis Aff."; Doc. 71, "Mastroianni Decl."; Doc. 72, "Def. Br.").[1] The Government served and filed its opposition brief on August 8, 2022 (Doc. 74, "Gov't Br."), and the motion was briefed fully with the submission of Defendant's

---

[1] Defendant submitted exhibits with his motion papers, including two audio files marked as Exhibit A (collectively, "Ex. A"). Exhibit B is Defendant's transcription of those audio recordings. For ease of reference, the Court cites herein to Defendant's written transcript, "Ex. B", when referencing law enforcement's interview of Defendant on August 20, 2020.

reply declaration (Doc. 75, "Reply Decl.") and reply memorandum of law on September 6, 2022 (Doc. 76, "Reply Br.").

The Court held a status conference on September 20, 2022 and heard argument from the parties on the extant motion. (*See* Sept. 20, 2022 Min. Entry). The Court determined that the parties' submissions, including the audio recordings of law enforcement's August 20, 2020 interview of Defendant and Defendant's transcription thereof, were sufficiently detailed so as to demonstrate the absence of contested issues of fact, except that an evidentiary hearing on the limited issue of the custodial nature of the interview during a 45-minute gap between the two audio recordings was granted.[2] The parties, in advance of the hearing, submitted correspondence to the Court setting forth their anticipated witnesses, testimony sought to be elicited, and exhibits expected to be introduced.

The Court held an evidentiary hearing on October 11, 2022, limited to adducing evidence concerning what occurred in the 45 unrecorded minutes of the interview. Defendant called to the stand FBI Special Agents Andrew Kearns and Pao Mei Fisher (the "Agents")—who jointly conducted the August 20, 2020 interview of Defendant.[3] The Court reserved decision on the motion.

---

[2] "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Cantoni*, No. 19-4358-CR, 2022 WL 211211, at *3 (2d Cir. Jan. 25, 2022) (quoting *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (alteration in original)). In other words, a hearing concerning the 45-minute gap in the audio recording was necessary in this case only to the extent there were "contested issues of fact that must be resolved in order for this Court to rule on [the] motion to suppress." *United States v. Holt*, No. 21-CR-00080, 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021); *see also United States v. Merced*, No. 19-CR-00832, 2021 WL 5647827, at *11 (S.D.N.Y. Nov. 30, 2021).

[3] Citations to the hearing transcript will be cited herein as "Tr. __".

Based upon the parties' written submissions, the evidentiary hearing, and for the reasons set forth below, Defendant's motion is DENIED.

## BACKGROUND

Federal agents arrived at Defendant's residence at approximately 6:00 a.m. on August 20, 2020 to execute a search warrant.[4] (Mastroianni Decl. ¶¶ 3-4). Law enforcement knocked on the door and Defendant answered. (*Id*.). Law enforcement briefly, for their safety upon entry, placed Defendant in handcuffs. (Tr. at 8:6-8; Ex. B at 1). Defendant advised law enforcement that he had an unlicensed gun and identified its location. (Mastroianni Decl. ¶ 5). Law enforcement secured the gun and thereafter, at approximately 6:15 a.m., FBI Special Agents Andrew Kearns and Pao Mai Fisher asked to speak to Defendant outside on the balcony of his residence. (*Id*. ¶ 6; Ex. B at 1-2).

The Agents immediately removed Defendant's handcuffs and advised Defendant, "you're not under arrest all right, you are free to leave at any point in time if you feel that you want to." (Ex. B at 2). Defendant asked to use the restroom and to take his prescription Adderall, which the Agents facilitated. (*Id.* at 2-3). Upon his return from the bathroom, the Agents again advised Defendant, "you're not under arrest. If you want to leave at any point in time, feel free. We just wanna kinda talk to you and explain kinda uh what we have and ask you just a few questions," to which Defendant responded "sure." (*Id.* at 3). The Agents elicited information concerning the electronic deives Defendant used and their location, websites and apps frequented, phone numbers, e-mail addresses, usernames, passcodes, and his sexual activities. (*Id*. at 3-25).

---

[4] Magistrate Judge Lisa M. Smith issued a search warrant on August 20, 2020 for a search of Defendant's residence for evidence of the possession, transportation, receipt, distribution, and production of child pornography and to seize computers, other electronic devices, and evidence related to the distribution, receipt, and possession of child pornography. (Doc. 1 ¶ 12).

When asked if Defendant would allow law enforcement to log onto his account on a peer-to-peer file share website (the "P2P Website"), Defendant responded, in sum and substance, that he felt he should have a lawyer present. (*Id.* at 25). The Agents told Defendant that they just wanted to "hear [his] side," and that their questioning of him was not an interrogation, rather just "a conversation, an interview." (*Id*. at 25-27). The Agents reiterated to Defendant that he was not under arrest or being charged with a crime, stating that: "like I said when we first sat down is, is still true is at any point in time if, if you want to leave, the door is open, nobody is going to stop you . . . you're free to go." (*Id*. at 27). The Agents continued, "I just wanna let you know that it's . . . completely voluntary for you to be here. You're not being interrogated or anything. We're not charging you with a crime. . . . You're not in custody. You're not arrested. Anything like that. You're free. If you want to be like, hey, you know, I'm going to Starbucks, it's like OK Fred, we'll a we'll be like . . . we'll give you a call when you can come back inside the apartment." (*Id.* at 27). Defendant thereafter continued to speak with the Agents about the electronic devices they should focus on in executing the search warrant, until the Agents asked how many times in the last month he had sent or received child pornography. (*Id.* at 27-30). Defendant then stated, "I really feel like I should have a lawyer, like, ah, ah, you're asking me a lot of things that like I just don't." (*Id.* at 30).

The Agents stopped questioning Defendant and sought to clarify whether he wanted to stop the interview and speak with an attorney, explaining: "And that's your right. If you want a lawyer, if you want to stop talking that's fine. We had some things that we were gonna go over with you, but it's your right that if you want a lawyer, that's completely your decision, we could stop our conversation." (*Id.*). Defendant thereafter responded that he would rather not continue to talk. *Id.* The Agents assured him that was fine and stated, "at this point, like you said, if you

4

would like to get a lawyer, what we are going to do is just," to which Mastroianni interrupted, saying, "Well, I don't really want to go get a lawyer because to me this is terribly embarrassing." (*Id*. at 32).

The Agents explained that they were leaving "the ball in [Defendant's] court" and that it was his choice whether to continue speaking to the Agents without an attorney present, or to stop talking to them. (*Id*. at 32). The Agents continued to emphasize that Defendant was free to go, this was just a "conversation" and they assured him that he was not under arrest. (*Id*. at 33, 36). The Agents again sought to clarify Defendant's position, stating, "I just wanna make it clear that you are comfortable to continue speaking without a lawyer present," to which Defendant replied "Yeah, yeah, as long as if you ask me something, I say I don't feel comfortable answering that, yeah, I mean." (*Id.* at 34-35). The Agents then again sought confirmation, "All right, so you would like to continue speaking without a lawyer present," to which Defendant reiterated "I will continue speaking with the agreement that if I don't feel comfortable answering a question, I could say I would rather not answer that." (*Id.* at 35). The Agents then administered *Miranda* warnings to Defendant. (*Id.* at 36-37). Defendant signed the advice of rights form, acknowledging that he understood his rights and was "willing to answer questions without a lawyer present." (Lewis Aff., Ex. C).

Defendant asked, "without sounding snarky but why didn't you give me this before you started questioning me." (Ex. B at 37). The Agents again explained that Defendant was not in custody, such the *Miranda* warnings were not necessary but were being given because Defendant said he maybe wanted a lawyer and changed his mind; the Agents wanted to ensure that Defendant understood his rights. (*Id*.). The Agents then continued speaking with Defendant and showed him various photographs to identify. (*Id*. at 38-46).

5

At this point in the interview—roughly one hour and fifteen minutes in (Ex. A)—the recording stopped for approximately 45 minutes. With respect to those 45 unrecorded minutes, the Court considers the testimony of Defendant and the Agents adduced during the October 11, 2022 evidentiary hearing. The Court credits some of Defendant's testimony[5] to the effect that he subjectively believed he was in custody because he was handcuffed when law enforcement arrived at the residence, and because he had a loaded, unregistered firearm in his possession. (Tr. at 84:14-85:16). The Court also credits Defendant's testimony that during the unrecorded 45 minutes, he told Special Agent Kearns that "I don't really feel comfortable talking to you, I think I need to have an attorney" but the conversation "[g]radually worked its way back into being a conversation again." (*Id*. at 83:3-21).

The Court finds Special Agent Kearns' testimony to be credible[6] and credits those portions of his testimony where Special Agent Kearns explained that, in the period of time the recording device was not recording, Defendant was not questioned anywhere other than the balcony of his residence; Defendant was not physically restrained; Defendant's freedom of

---

[5] The Court does not credit Defendant's testimony that he attempted to go inside his residence to help Special Agent Fisher with a computer and was prevented by Special Agent Fisher from going inside. (Tr. at 84:1-13). Neither of the Agents testified to the occurrence of such an incident, and Defendant, having submitted two declarations in connection with this motion, did not raise this alleged incident until the end of the evidentiary hearing after hearing the Agents' testimony. Regardless, even if the Court did credit this testimony, it would not alter the Court's conclusions herein. Temporary restrictions on a defendant's movement, particularly during a search, are not custodial for purposes of *Miranda*. *See, e.g., United States v. Schaffer*, 851 F.3d 166 (2d Cir. 2017) (defendant prevented from leaving scene of search to prevent him from walking past seized evidence); *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (defendant told to stay in his living room during execution of a search).

[6] To the extent Defendant takes the position that the Court should wholly disregard the Agents' testimony because of inconsistencies in the explanation by the Agents of what caused the recording device to stop recording, that argument is rejected. The sole purpose of the evidentiary hearing was to elicit testimony concerning the custodial nature of the interview. Why the recording device stopped recording, or how it occurred, is not relevant to the Court's analysis of the custodial nature of the interview.

movement was not restricted in any way; Defendant was not told by any law enforcement officer that he was under arrest or not free to leave the balcony; and that law enforcement did not make physical contact with Defendant or draw their weapons. (Tr. at 36:13-37:15). The Court further credits Agent Kearns' testimony to the effect that, during the 45 unrecorded minutes of the interview, he did not recall Defendant attempting to end the interview, asking to leave the balcony or apartment, saying he no longer wanted to speak to the Agents, or asking for a lawyer. (Tr. at 37:16-38:5).

The Court likewise credits Special Agent Fisher's testimony concerning the unrecorded 45 minutes, specifically, that for the majority of that time she was not on the balcony with Agent Kearns and Defendant. (Tr. at 73:3-5). To the extent Agent Fisher was present, on her way into the apartment leaving the interview, and upon her return to the balcony, the Court finds credible and complete Agent Fisher's testimony that Defendant was not in handcuffs, physically restrained, told that he could not leave his apartment, or told that he was under arrest; nor did law enforcement make physical contact with Defendant, draw their weapons, or restrict Defendant's freedom of movement. (*Id*. at 75:1-24, 76:10-77:23).

The recording picks back up with Defendant sharing passwords with the Agents. (Ex. B at 46). During each segment of the recorded interview, the Agents' tone was conversational and non-aggressive. (*See generally* Ex. A). At the end of the interview and conclusion of the search of his residence, at approximately 9:30 a.m., Defendant was placed back in handcuffs and taken from his apartment through the building to FBI headquarters in Rye, New York. (*Id*. at 75-76).

## ANALYSIS

Defendant argues that he was in custody when the Agents interviewed him without advising him of his *Miranda* rights, that he was questioned after invoking his right to counsel,

and that even when he was advised of his *Miranda* rights and agreed to waive them, that waiver was involuntary because law enforcement applied coercive tactics. Therefore, Defendant argues, the statements he made to the Agents should be suppressed along with the evidence obtained derivatively therefrom.

The prosecution may not use, absent a warning, a statement elicited by the police during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 448-50 (1966). For *Miranda* safeguards to apply, a person must both be "in custody" and subject to "interrogation." *United States v. Familetti*, 878 F.3d 53, 57 (2d Cir. 2017). "The Second Circuit applies a two-step objective inquiry to determine whether a person is in custody for purposes of Miranda: (1) whether a reasonable person would have thought he was not free to leave the law enforcement encounter; and (2) if so, and in addition to not feeling free to leave, whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Belitz*, No. 21-CR-00693, 2022 WL 205585, at *2 (S.D.N.Y. Jan. 24, 2022) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). The "free to leave" inquiry is a necessary, but not determinative first step; "[t]he 'ultimate inquiry' for determining *Miranda* custody . . . is that articulated by the Supreme Court in *California v. Beheler*: whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id*. at 670 (internal citations and quotation marks omitted).

Courts consider, in making this inquiry, "whether a reasonable person would have thought he was not free to leave based on the totality of the circumstances, including factors such as 'whether a suspect is or is not told that []he is free to leave; the location and atmosphere of the interrogation; the language and tone used by the police; whether the suspect is searched, frisked, or patted down; and the length of the interrogation.'" *Belitz*, 2022 WL 205585, at *3 (quoting

*Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998)). "This is an objective inquiry, and a suspect's subjective belief about his status 'generally does not bear on the custody analysis.'" *Id*. (quoting *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016)).

Defendant was not under arrest when he made the pre-*Miranda* statements at issue. "In the absence of actual arrest, an interrogation is not custodial unless the authorities affirmatively convey the message that the defendant is not free to leave, or that he is completely at the mercy of the police." *Familetti*, 878 F.3d at 60 (internal quotation marks and citation omitted). The circumstances of this case are analogous to *Familetti*. There, the Second Circuit held that the defendant was not in custody when he was asked to cooperate with law enforcement to help them investigate child pornography, despite the presence of nine agents in his home during the interrogation and notwithstanding his being handcuffed at the outset of the encounter. *Id*. at 61-62.

Like in *Familetti*, Defendant was interviewed on the balcony of his own home; the Agents advised Defendant several times that he was not under arrest and was free to leave; although agents restrained Defendant when they first entered the residence for safety reasons, the handcuffs came off before the Agents began interrogating him; the Agents engaged him in a tone that was non-confrontational (*see generally*, Ex. A); and the Agents' weapons were never drawn. *See, e.g., Faux*, 828 F.3d at 139 (two-hour interview conducted while 10 to 15 agents "swarmed" the defendant's home held non-custodial); *Newton*, 369 F.3d at 675 ("[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."); *United States v. Cota*, 953 F.2d 753, 758-59 (2d Cir. 1992) (concluding that the defendant was not in custody where the "initial use of guns and handcuffs [were] necessitated by the officer's safety, but the handcuffs were removed as soon as . . . the perceived safety threat

abated"); *United States v. Bershchansky*, 958 F. Supp. 2d 354, 382-83 (E.D.N.Y. 2013) ("[T]he court finds that the government agents informed defendant he was not under arrest and was free to leave at the time of the search, factors establishing that defendant could not reasonably understand that he was in custody."), *aff'd*, 788 F.3d 102 (2d Cir. 2015).

Defendant also makes arguments based on his subjective state of mind stemming from the time of the initial encounter with law enforcement, arguing that because he was initially handcuffed and had advised law enforcement that he had a loaded, unregistered firearm in the residence, he believed he was in custody for the duration of the interview. (Def. Br. at 8). While it is clear from his declarations and testimony at the evidentiary hearing that Defendant subjectively believed he was not free to leave, the custody inquiry for purposes of *Miranda* is an objective analysis. *See Faux*, 828 F.3d at 135 ("[t]he test for determining custody is an objective inquiry"); *Belitz*, 2022 WL 205585 ("[t]he Second Circuit applies a two-step objective inquiry to determine whether a person is in custody"), at *4. Defendant's initial restraints cannot establish a state of custody for the duration of his interactions with the police. *See Familetti*, 878 F.3d at 61; *Bershchansky*, 958 F. Supp. 2d at 383 ("Even the use of handcuffs prior to an interrogation, however, does not automatically render the interrogation custodial."). Nor was Defendant in custody simply because he had advised law enforcement of his unregistered firearm. (Reply Br. at 2-3). Defendant was not told that he was under arrest for the firearm; to the contrary, he was

repeatedly told throughout the interview, including minutes after identifying the firearm, that he was not under arrest.[7]

Nothing about the location and atmosphere of the interview, the language and tone used by the Agents, the manner in which Defendant was temporarily restrained, or the length of the interview would lead a reasonable person to objectively conclude they were in custody for purposes of *Miranda*. A reasonable person in Defendant's situation would not feel restricted to a degree comparable to a formal arrest, especially where the individual was in their own home, not handcuffed or otherwise physically restrained, and repeatedly told they were not under arrest and were free to leave. Accordingly, Defendant was not in custody at any time during the interview.

Defendant's remaining arguments in support of suppression likewise fail. With respect to Defendant's contention that he was improperly questioned by the Agents after asking for counsel, even assuming that Defendant had clearly invoked his right to counsel, there is simply no basis for suppression because Defendant was not subject to custodial interrogation.[8] *See*

---

[7] Defendant attempts to distinguish *Familetti* from the facts of this case on the grounds that "Mr. Familetti did not have the police recover a loaded unlicensed firearm" which, Defendant argues, is a felony offense. (Reply Br. at 3). Defendant ignores the circumstances in *Familetti*: although law enforcement were not confronted with a firearm offense, an undercover agent whom Familetti had recently met in person and agreed to pay to deliver an 11-year-old child for the purpose of sex, arrived at Familetti's apartment at the agreed time with a task force to execute a search warrant, rather than with the child. The Court sees no palpable difference between these two different felony offenses for purposes of the custodial detention analysis.

[8] In any event, Defendant did not clearly invoke his right to counsel. It is clear that Defendant equivocated, as reflected in the transcript, saying "I feel like I should have a lawyer." (Ex. B at 25, 30). And Defendant testified that during the 45-minute unrecorded period of the interview, he said, "I don't really feel comfortable talking to you, I think I need to have an attorney." (Tr. at 83:9-10; *see also* Reply Decl. ¶ 14). These remarks were not effective to invoke the right to counsel, as ambiguous references to an attorney do not constitute an invocation of rights. *See, e.g., Diaz v. Senkowski*, 76 F.3d 61, 64-65 (2d Cir. 1996) (after earlier waiver of right to attorney, remarks that "I think I want a lawyer" and "do you think I need a lawyer?" did not "effectively assert his right to counsel"); *United States v. Banki*, No. 10-CR-00008, 2010 WL 11606510, at *2 (S.D.N.Y. Mar. 24, 2010) (statement that "I think I need a lawyer" was not a request for counsel).

*Montejo v. Louisiana*, 556 U.S. 778, 795 (2009) (explaining that *Miranda* "applies only in the context of custodial interrogation. If the defendant is not in custody then those decisions do not apply"); *see also United States v. Clark*, 19-CR-00155, 2022 WL 1210478, at *14 (W.D.N.Y. Apr. 25, 2022) ("Defendant was not in custody at the time of her interview, and therefore her Fifth Amendment right to counsel under *Miranda* was not triggered."); *United States v. Zaleski*, 559 F. Supp. 2d 178, 189 (D. Conn. 2008) (*Miranda* rights cannot be asserted outside the context of custodial interrogation . . . . An individual cannot, therefore, assert his or her *Miranda* right to counsel before he or she is in custody." (internal citations omitted)).

Defendant's final argument that his *Miranda* waiver was involuntary because law enforcement applied coercive tactics also falls flat. Defendant, "who could read and write, and expressed his familiarity with his rights" signed an express "waiver-of-rights" form, thus knowingly and freely waiving his rights before speaking. *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (internal quotation marks and citations omitted); *see also United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) ("In general, a suspect who reads, acknowledges, and signs an "advice of rights" form before making a statement has knowingly and voluntarily waived *Miranda* rights.). The totality of the surrounding circumstances supports the conclusion that his waiver and the statements made were voluntary, including Defendants characteristics— his age, education, experience, and background—as well as the conditions of interrogation, and the conduct of law enforcement officials. *Taylor*, 743 F.3d at 23-24; *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988).

Defendant, who presented as an intelligent, educated, 50-year old businessman, advised the Agents during the interview that he "took enough classes in college the two years I went to know that" the Agents were "allowed to lie during interrogation," and even expressed familiarity

12

with *Miranda*. (*See generally* Ex. B). For the same reasons the Court found Defendant was not in custody during the interview as described *supra*, the conditions of the interview and the conduct of law enforcement, considered together with Defendants' characteristics, do not compel a finding of coercion. Defendant argues that law enforcement employed "artful deception" to elicit inculpatory statements, but just because law enforcement "emphasized cooperation and deemphasized, but did not misrepresent, the criminal nature of the inquiry" does not render his statements involuntary. *United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992). The record evidence demonstrates the absence of any coercion that would render Defendant's statements or his express *Miranda* waiver involuntary.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion to suppress statements and evidence obtained derivatively therefrom is DENIED.

In light of the Court's ruling herein, the conference scheduled for December 12, 2022 at 10:00 a.m. is cancelled. The Court will separately docket a Pretrial Scheduling Order.

As noted during the October 11, 2022 conference, time has been excluded under the Speedy Trial Act through December 12, 2022.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 69.

**SO ORDERED.**

Dated: White Plains, New York
December 2, 2022

_____
Philip M. Halpern
United States District Judge